Hand v. Dexter

---

NATHAN H. HAND et al., plaintiffs in error, *v.* THOMAS C. A. DEXTER et al., defendants in error.

(Atlanta, January Term, 1871.)

CORPORATIONS—EQUITY—APPOINTMENT OF RECEIVER—WHEN AT INSTANCE OF MINORITY—WHAT MUST BE SHOWN IN BILL.—It is only in a strong case, and when the majority are clearly violating the chartered rights of the minority, and putting their interests in imminent danger, that a Court of Equity will, at the instance of a minority of the stockholders in a corporation, interfere with the management of its affairs, and appoint a Receiver, and in such a case a bill with mere general charges of fraud, illegality or mismanagement is demurrable. Such facts must be stated, as will, if true, clearly show illegal action by the majority, so as to endanger the interests of the minority, and make the interference of Court necessary for the protection of their rights.

MULTIFARIOUSNESS—WHAT IS NOT.—Where complainants claim by the same right, charge a common wrong and pray a common redress, the bill is not multifarious.

Hand v. Dexter

NON-JOINDER OF PARTIES—NO GROUND FOR DEMUR-RER—AMENDMENT.—The non-joinder of some who should be parties is not ground for general demurrer to a bill, for that may be cured by amendment.

Corporations.    Equity Pleading.    Before Judge Knight. Chambers.    Lumpkin County.    December, 1870.

*Dexter, and about a dozen others, not residing in this State, but in Boston, Massachusetts, Pennsylvania, and New York city, with Richard Van Dyke, of said county, as trustee, filed their bill containing the following averments. They, with said Van Dyke as trustee, own in their own right thirty-two thousand six hundred and fourteen shares of the capital stock of the Yahoola River and Cane Creek Hydraulic Hose Mining Company, a corporation of this State, having its office in Lumpkin county, (setting forth their respective names and respective amounts of stock, and that Van Dyke, as trustee, owns forty-three thousand and seventy-six of said shares) which stock is worth, say $320,140 00. Before the late war said company had expended, say $100,000 00 in putting its property in condition for successfully mining for gold and other minerals, by cutting a canal, making flumes and trestle work twenty miles long, to take the water of said river from its channel and bring it upon the gold mines of said company, and had bought land and erected gold mills and other mining machinery and fixtures, worth, say $500 000 00. At the beginning of said war the stock was worth $10 00 per share or par.

By reason of the war the operations of the company were suspended from 1861 to some time in 1866, and during that time said property became much dilapidated, and needed repairs and other improvements to fit it for mining. Wherefore, in 1866, in Boston, a meeting of all the stockholders was held to arrange for fitting said property for mining. By a vote of all the stockholders, twenty thousand or more of said shares were set apart for said purpose. Harvey King, of Boston, proposed to the stockholders that, if they would turn over to him these shares so set apart, he would advance the money necessary to make said repairs and improvements, and take said shares at not less than $2 50 per share, or sell the same, as he might deem best, at not less than that price. They accepted his proposition, turned over to him these shares and put the whole business of the company under his sole management and supervision. And to enable King the *better to control the property, they then and there elected him Treasurer and Secretary of the company.

Under said contract, in 1866, King came to said county, and after inspecting said property pronounced it immensely valuable, began the repairs, etc., spending large sums of money. Being still more convinced of the great value of the property, King undertook to defraud the stockholders, and

especially complainants, by surreptitiously and fraudulently managing the business and affairs of said company so as to make it appear to the stockholders and all others that neither the property nor stock was of any value, and by refusing to furnish the funds necessary to complete said work. He also entered up an account against the company for salaries and cash furnished, to say $20,000 00, intending to sue thereon and sell said property under a judgment therefor, and buy it at his own price.

After King's thus bringing said property and stock into such disrepute as to render it valueless, and after repudiating his said contract to furnish money and entering said account against the company, another meeting of all the stockholders, was called to sit on the 14th of October, 1867, in Boston, to raise money to put said property in efficient working order. At said meeting, Nathan H. Hand, of Vermont, was elected as King's successor, as treasurer. All the stockholders (except two or three, including Van Dyke) then and there agreed with Hand to transfer all of said property to him for two years, and its absolute control during that time, without hinderance by any of the stockholders there agreeing, and to a transfer of thirty-seven thousand and ninety-three shares of said stock to him as treasurer, to be held by Hand and his successors in office, in trust as treasurer, for the uses and purposes recommended by a committee of stockholders then and there appointed by the stockholders, in consideration that he would furnish money and put said works in good order and pay the debts. This committee was so to dispose of the stock as to take from each stockholder, pro rata, sufficient to raise said last number of shares mentioned, and so as not to take over one-half of each one's shares. This *stock, thus set apart, was to be applied to the payment of the company's debts, extension of its canal and to get machinery, etc., to make its operations successful. Any surplus, not used by Hand in accomplishing those purpose, was to be refunded to the contributing stockholders, pro rata, according to their stock contributed. Hand was then to hold these shares without power to assign, sell or pledge them, until the end of said two years, (unless before so instructed in writing by a vote of two-thirds of the directors of the company, with the concurrence of the treasurer), and then he was to re-assign them to those who had assigned them to him, as such treasurer. Under this arrangement, these shares were assigned to and accepted by Hand. King was present when all this was done and agreed to it. After Hand took possession of the property under that arrangement, King agreed to take stock in payment of his pretended claim of $20,000 00, and Hand did pay it off in stock, and yet King still holds said stock and votes it as his own. And after King got this stock, he, being a director of the company, combined with Hand and others to reduce the

value of said property and stock. King repudiated his agreement to take stock in payment of his said claim, and King and Hand combined with four other named directors of said company, all of Massachusetts, and these four, with the knowledge and consent of King and Hand, but without notice to the other directors, secretly met with King and fraudulently passed a resolution authorizing the president of the company to mortgage all of the property of said company, (except said thirty-seven thousand and ninety-three shares), to secure $20,000 00 to King and all advances made and to be made for the company by Hand. This mortgage was executed by the president in December, 1868, and bound King to wait till the following October for his $20,000 00 and interest, and he and Hand released, by its acceptance, all claim on the individual stockholders, and Hand was to rebuild the trestle which had fallen down; was to keep possession as mortgagee, not as treasurer; to receive his salary a part of the necessary expenses of the work, and at the end of King's credit to pay King half of the proceeds *of the operations till King's debt was discharged, and to use the balance towards paying his own demands. This mortgage was recorded in Lumpkin county, Georgia, on the 18th of March, 1869.

Complainants say said directors had no right to make said resolution, and that it was done to defraud them. They averred that, by reason of the foregoing agreements, the company was not indebted to King or Hand; that King's debt was paid and Hand had bound himself to take pay for his advances out of said stock, etc., turned over to him. Hand paid off some of the creditors of the company by a heavy share and thereby depreciated the stock. Other debts he would not pay and suits were brought and judgments were obtained against the company, and its property is now at the mercy of the plaintiffs in fi. fa. Hand having put said works in operation and having possession since said mortgage, exclusively, of all the property of the company as mortgagee, was working it for the purposes of said mortgagees, up to the 14th of March, 1870.

On the 11th of March the clerk of the company mailed to each stockholder a written notice that an annual meeting of the stockholders would be held "on the second ——— in March, 1870," for election of officers and other business. As appears bv the exhibits, on the 14th of March there was a meeting, at which thirty-three thousand four hundred and ninety-five shares were represented. At said election Howe was re-elected President; Hand, Treasurer; and King, Vice-President. At said meeting it was reported that the auditing committee of the stockholders had found the company indebted to Hand $60,564 87, and that King and Hand had released said property from mortgage and ordered the release to be recorded, but did not discharge the company from any part of the debts. Complainants charge that this was but a

pretended meeting of the stockholders, and that its said action was intended but to deceive said other stockholders by said release. Said meeting was adjourned over till April 14th, 1870. Under this fraudulent arrangement with said directors and said committee, who are combined with him, Hand *has control of $500,000 00 worth of property, and is getting $1,500 00 worth of gold dust weekly, and they are applying it to their own use. And they charge that the auditing committee fraudulently put said Hand's claim at the sum aforesaid and they and said directors knowingly allowed Hand to use ten thousand shares of said stock to control their election, and Hand has used, and is using, them for his private purposes.

The exhibit of the minutes of the said last meeting show that the officers were elected by but ten thousand shares majority, and that Hand voted three thousand one hundred and forty shares. These shares they say, belong to the company and not to Hand, and he could not, legally, vote them. They say they had no legal notice of said meetings of March and April, 1870, but "by some means hearing" of the meeting of April, 1870, they sent Weir Boyd, Esq., to represent them; that he went and found nobody present but Hand and the clerk of the company, who claimed to hold the proxies of a large number of stockholders; that the clerk presided, saying he was elected to preside at the meeting of March, 1870, (he was elected a director that day;) and Hand and the clerks both claimed that this was but an adjourned meeting from March, 1870. Boyd then moved to reconsider the action of March, 1870, and elect officers, but Hand using said ten thousand shares, and the clerk and he voting their proxies, and counting but one-half of the stock of Boyd's stockholders, out-voted Boyd, and he, protesting that the foregoing proceedings were all fraudulent, contrary to the by-laws, etc., retired from the meeting.

These complainants have tried to get Hand to settle; all the directors but the clerk are non-residents; and yet Hand keeps all the property, appropriates its rents, issues and profits, and is sending them from the State.

They prayed that Hand and King be compelled to perform their original agreements; that said mortgage be annulled; that said thirty-seven thousand and ninety-three shares be retransferred to the contributing stockholders; that the property be taken from Hand and turned over to a Receiver; that *defendants account for all the gold taken; that the meetings of March and April, 1870, be declared illegal; and that the books and records of the company be turned over to such Receiver. Discovery was waived.

To this bill defendants demurred, upon the following grounds: 1st. There is no equity in the bill entitling complainants to the relief prayed for. 2d. The remedy in law is complete.

Hand v. Dexter

3d. The bill is multifarious, because complainants have no common interest in the matters set out in the bill and the causes of action are distinct, and the defendants have no joint or common interest.    4th. Because the exhibits show that there are other stockholders who are not parties, one of whom is a director, against whom no complaint is made.    5th. Because complainants do not aver that they have exhausted their ability to get redress in the company, or that they represent a majority of the stock. 6th. Because there is no exhibit of the original contract with Hand.    7th. Because said mortgage is annulled.    8th. Because the Court cannot set aside the election of corporation officers, etc.    By consent this demurrer was heard in Chambers and was overruled by the Chancellor on all the grounds taken.    This is assigned as error on said grounds.

George D. Rice, for plaintiff in error.    As to multifariousness, cited 3 Story's Eq. P., secs. 271. 279, 280, 282, 530; Dan. Cr. Pr., 391, 395, 384.    There is no sufficient charge of fraud: 36th Ga. R., 518; 38th, 512, 514.    The remedy is complete at law: Doug. R., 524; 10th John., 484; 38th Ga., 259.    Equity will not interfere in such cases: 2 Hare, 461, 494; Abbott's Dig., 414; 1st Vesey and B., 154; Eden on Inj., 361 and note; 19th Ga., 490; 18th Ga., (McDougald v. Bellamy) Code, sec. 1619; 8th Cush., 588; Abbott's Dig., 310, 544, 774; Ang. & Ames on Corp. secs. 140, 499, 221, 201.    Formal meeting or vote not necessary: Abbott, 280, 232, 550.    The stockholders are personally liable for debts of company: Acts 1868, p. 71.    Discovery waived, give remedy: 12 Ga. R. 9; 17th, 558.    As to the meetings of March and April, 1870: Ang. & A. on *Corp., secs. 488, 460.    As to voting stock: Abbott's Dig., 309; Ang. & A. on Corp., 136.    Quo warranto remedy against officer: Code, sec. 3147; Ang. & A. on Corp., 734 and note; 15 John. Ch., 378-9.

Weir Boyd, John A. Wimpy, for defendants.    As to jurisdiction in equity, cited Ang. & Ames, secs. 312, 391-2-3; 18th Howard, 341-2; 11th Ga., 569; 1st Story's Eq., sec. 29; Code, sec. 3137: 2 Paige, 222; 2 Black 720. 721; 21st Ga., 251: 23d, 139. As to multifariousness: 3 Paige, 231; Story's Eq. Pl., 278a, 271; 5th Ga. 571-5, inclusive; 8th Ga., 236; 9th, 280, 281.    There are sufficient parties to the bill: 3 Paige, 222; 3 Mason, 317.    Quo warranto or mandamus is not complete remedy: 22 Ga., R., 507, 539.

McCAY, J.

1. The complainants in this bill are the owners of '———— thousand shares of stock in an incorporated mining company of one hundred thousand shares.    Its object is to take the property out of the hands of the company, the stockholders, place

it in the hands of a Receiver, and that a general account be taken. As a Court of Equity will not appoint a Receiver to carry on the business of mining, it follows that there can be no sufficient cause for such a bill, unless the majority of the stockholders are pursuing a course so illegal and ruinous as to require the affairs of the company to be stopped.

The very foundation principle of a corporation, is that majority of its stockholders have a right to manage its affairs so long as they keep within their chartered rights. They may, they often do, manage very foolishly, make very bad contracts, and do very reckless things. Indeed, as all experience shows, the very business which this company was chartered to carry on is one of great risks and extraordinary vicissitudes, and it would be madness for a Court to put its cautious and careful hand forward to keep steady an enterprise organized for such risks and undertakings as necessarily pertain to gold mining.

462     *There is no pretense in this bill that the company is undertaking anything outside of the charter. The burden of the complaint is, that the majority, through the officers, are managing the company fraudulently, not for the benefit of all, but in the interest of a portion of the stockholders. This is the general charge, and that charge is sustained by the following statement of facts: 1st. The whole company granted to King $20,000 00 in its stock, and King after awhile repudiated the agreement, and set up a claim for $20,000 00 expended by him for the company. 2d. The whole company, consenting to this repudiation by King, surrendered to Hand, as treasurer, thirty-four thousand shares of the stock, to be used by him to raise funds, under the direction of a committee, to put the works in order and pay the debts.

Hand expended (he says and the committee say) three thousand dollars and did put the works in order. He has taken ten thousand shares as part pay for his expenditures, and has an unsettled claim against the company for the balance. There is no charge that he has not certified the money. It is true, the bill says the true construction of the arrangement surrendering the thirty-four thousand shares to the company is, that Hand was to take these shares in pay for his expenditures. We are not prepared to say this. The contract does not say so. We see nothing in the charter to forbid expenditures on credit to put the works in order, and if Hand, with the consent of the directors, was willing to do the work or advance the money, we see no reason why the directors might not permit him to do so. He seems to have acted all the time with the approbation of the directors, and indeed, in every thing stated in the bill and complained of, the directors and officers of the company seem to have acquiesced. At the last two meetings of the company, he was

sustained in all his acts, and he is still the regular treasurer of the company.

The charge that he and others have been guilty of a fraud in executing a mortgage in violation of the understanding, at the time he was elected treasurer, does not, in our judgment, amount to much. If it was a fraud, it was repented of *almost immediately, since it was, soon after its execution, surrendered and is not now at all in the way.

Nor are we prepared to say it was a fraud. We see no reason why the directors might not, to meet the new difficulties, make such an instrument. That both King and Hand have expended their money, to put these works in order, plainly appears, and how it can be a fraud to make them secure we are not able to see.

It is also charged that the complainants had no notice of the meeting of the company at which these acts of Hand were approved. The bill sets forth a certificate of the clerk, taken from the minutes, that he had sent the usual notice, nor does the bill deny its truth. It says they did not have legal notice, sufficient notice. This is very general. Do the by-laws fix any rule? The bill does not show whether or no the meeting is admitted, and it appears to have been the annual meeting. Is any special notice required of such a meetings? By the general law, we should say not, unless the by-laws so required, and this the bill ought to show.

At the meeting the majority largely sustained Hand and the directors in all their acts. It is said, too, that the chairman refused to count more than half their stock. But was not this the bargain, and did he not do the same with all, who, by the agreement of the old stockholders, had surrendered half to the company. Upon the whole we think the charges in this bill are too loose and unsatisfactory to justify the prayer.

If the majority of this corporation are, in fact, managing the affair in the interests of Hand, let the minority appear at the annual meeting, or call one, according to the by-laws, and demand that the true state of the company and its affairs be presented to the meeting. If this be refused, or if, on examination, anything rotten appears, the presumption is that right will be done. If not, let all the facts—not guesses and suspicions—be presented to the Chancellor. As it is, the Court is groping in the dark, under mere general charges, and is just as apt to do wrong as right in entertaining jurisdiction *of the bill. For these reasons we think the bill is demurrable and ought to have been dismissed.

The majority of a corporation have a right to manage their affairs as they think fit, so long as they keep within their charter, and a Court of Equity will not interfere to prevent unwise or improvident acts; there must be fraud or the infringement of the legal rights of some one, to justify taking matters out of the hands of the officers.

2. We do not think the bill multifarious. The complainants' claim, by the same right, charge a common wrong and pray a common redress. Indeed, there is a privity between them and the corporation, which makes one matter of the whole purpose of the bill.

3. The fact that some parties are not joined who ought to be, is not good by way of general demurrer, as the complainants can amend that.

Judgment reversed.