# CHARLESTON.

SMILEY *et al* v. THE NEW RIVER COMPANY *et al.*

Submitted September 12, 1912.   Decided March 18, 1913.

1. CORPORATIONS—*Corporate Management—Authority of Majority Stockholders.*

   The majority of the stockholders of a solvent going corporation, in the absence of fraud, or conduct amounting to fraud, and so long as they keep within their charter, have the uncontrollable right to manage the corporate affairs and a court of equity will not interfere at the instance of a minority of the stockholders, by receivers or otherwise, to control corporate acts or management. (p. 223).

2. EQUITY—*Answer as Evidence—Evidence to Overcome.*

   Where the equities of the bill on which a receiver of a solvent going corporation is sought are fully denied by sworn answers, and the evidence adduced in support of the bill does not overcome these denials a receiver should not be appointed. (p. 237).

3. CORPORATIONS—*Rights of Individual Stockholders.*

   Individual stockholders of a corporation having grievances must seek relief through the corporation itself, first by application to the directors, and then to the stockholders before appealing to a court of equity on their individual initiative. (p. 237).

Appeal from Circuit Court, Fayette County.

Bill by J. W. Smiley and others against the New River Company and others.   Decree for plaintiffs, and certain defendants appeal.

*Reversed and Remanded.*

*A. C. Burnham, Brown, Jackson & Knight,* and *Dillon & Nuckolls,* for appellants.

*John H. Holt, E. E. Williams,* and *Watts, Davis & Davis,* for appellees.

MILLER, JUDGE:

Plaintiffs, Smiley, Scarborough, Deegans, MacDonald, Sr., and MacDonald, Jr., suing on behalf of themselves and all other stockholders of The New River Company, who may join in the prayer of the bill and contribute to the costs of the suit,

on grounds alleged, prayed for an injunction against The New River Company, its officers and agents, from pledging for loans $1,500,000, residue of an issue of $4,000,000, of its bonds, secured by mortgage; for the appointment of a special receiver for that company, and of its seventeen so called subsidiary companies, with authority and direction to take immediate possession, control and management of the properties and business thereof and to conduct the same until the further order of the court; for the appointment of a commissioner, to investigate, state and report the then condition of the accounts between The New River Company and its said subsidiary companies and between each of them; and there is a prayer for discovery, and for general relief.

On the hearing of the motion for an injunction and the appointment of a special receiver, on bill, demurrer and answer thereto by The New River Company, and by each of said subsidiary companies, and on *ex parte* affidavits and depositions taken in court, the court below, awarded the injunction prayed for and appointed Samuel Dixon, W. E. Deegans and Eugene P. Carver, special receivers, with the powers and authority prayed for, basing its action on its conclusion from pleadings and proofs, that "The New River Company has been, and is, managing the properties and business of each of the defendants, its subsidiary Companies,     *     *     *     *     in an improper and illegal manner, and in violation of its charter powers, by the diversion of moneys belonging to one subsidiary company to the uses and benefit of another subsidiary company, which said subsidiary companies do not wholly have common stockholders, and which said management, in the opinion of the Court, is not only operating a fraud upon those stockholders in said defendant subsidiary companies who are not stockholders in the defendant The New River Company, to which fraud The New River Company, by such continued management, is making the plaintiffs herein *particeps criminis,* against their objection, contrary to their will and over their protest, but by such method of doing business and handling the funds of said subsidiary defendant companies is in the opinion of the Court, and as shown by the proof in this cause, rendering said subsidiary defendant companies, or some of them, unable to pay

their royalties in accordance with the terms of their respective leases, threatening them with forfeiture of said leases, by which said defendant subsidiary companies are threatened with the loss of their properties, or a material part thereof."

Many other grounds for relief are alleged, but the decree is predicated solely on the grounds recited therein. The other grounds relate mainly to disagreements between plaintiffs, a small minority of the stockholders of The New River Company, and the other stockholders and directors of the holding and subsidiary companies, as to the proper conduct of the business, and particularly as to who shall be manager of the several corporations. It is not pretended that the holding company or any of the subsidiary companies are insolvent; indeed it is alleged that the properties of each are very valuable, and under proper management would be profitable to the stockholders.

While it is sought to support the bill as one for an accounting, for fraud alleged, to prevent a forfeiture of some of the leaseholds, and for discovery, it is quite evident that the only matter really relied on is that on which the court below based its finding and decree. All other matters are met by the demurrers and answers, and if any of them constitute good grounds for relief, they are not supported by proper or sufficient proof. One of these, a subject also of the protest to the stockholders of June 12, 1912, hereafter alluded to, relates to the proposed sale or pledge of the $1,500,000, residue of $4,000,000, of bonds of The New River Company, authorized in July, 1909, under the administration of said Dixon, and covered by the injunction in the decree appealed from. The bill in the sixth paragraph admits the sale of $2,500,000, of these bonds about the time of their issue, at seventy-five cents on the dollar; but in the protest of June 12, 1912, to stockholders, and in the bill with which it is exhibited, it is complained that the sale of the residue of the bonds at not less than seventy cents on the dollar, the terms on which protestants say they are informed it is proposed to dispose of the same, will result in a waste of the properties of the subsidiary companies, and in foreclosure of the mortgage securing the same, and in the destruction of the value of the stock of protestants in The New River Company,

but the prayer of the bill and the injunction, as we have seen, is not against the sale of the bonds, but against the pledge thereof as security for loans, great or small, until the further order of the court, a prayer hardly covered by or consistent with any allegation of the bill. The sworn answers of the defendants, not controverted, meets the charge of the bill and protest, by showing that the sale of the $2,500,000 of these bonds at seventy-five cents was warranted by the nature of the bonds and the facts attending and involved in their issue; that this issue and sale at that figure was authorized in advance by the directors and subsequently unanimously ratified and approved by the stockholders, and that plaintiffs and protestants Scarborough and Smiley, present at the meeting, voted in favor thereof, Scarborough in the directors' meeting having seconded the motion therefor. We see nothing in the record, therefore, justifying the injunction against the sale or pledge of the bonds. No fraud is alleged or proven in connection therewith. Nothing in the law of corporations is better settled than that the majority of the stockholders of solvent going concerns, so long as they keep within their charters, and in the absense of fraud, or conduct amounting to fraud, have the uncontrollable right to manage their corporate affairs, and that courts of equity will not through receivers or otherwise, on the application of a minority, interfere with or attempt to control corporate action. And fraud if relied on must be specifically pointed out and proven. Generalities or conclusions of law will not do. Nor will mere mismanagement, mistakes in judgment, or unwise actions, amount to fraud in the absense of a showing that such action has been influenced by some outside purpose and regardless of the interests of the corporation. Alderson on Receivers, section 351; *Hand* v. *Dexter*, 41 Ga. 454; *Republican Mountain Silver Mines* v. *Brown*, 58 F. R. 644, 647; *Worth Mfg. Co.* v. *Bingham*, 116 F. R. 785, 790, (C. C. A.); *Ranger* v. *Champion Cotton-Press Co.*, 52 F. R. 609, 610; *North American Land & Timber Co.* v. *Watkins*, 109 F. R. 101, 105, (C. C. A.); *Gamble* v. *Q. C. W. Co.*, 123 N. Y. 91, 99; *Farwell* v. *Babcock*, 27 Tex. Civ. App. 162, 65 S. W. 513; *Fluker* v. *Emporia City R. Co.*, 48 Kan. 577, 580; *Callaway* v. *Powhatan Imp. Co.*, 95 Md. 177, 183; *Hill* v. *Gould*, 129 Mo. 106, 116;

*Edison* v. *Edison U. P. Co.*, 52 N. J. Eq. 620, 627; *Texas Consol. C. & M. Ass'n.* v. *Storrow*, 92 F. R. 5, 12. No such showing is made in this case.

The ninth paragraph of the bill was intended to cover the matter upon which the decree below appointing receivers was predicated. That paragraph and the replies thereto present the concrete case, and may be best shown by quoting them in full, as follows:

"IX. They further say that the manner in which the subsidary Companies have been managed and controlled by The New River Company, and their mining operations and business conducted, has been, and is, as follows:

"The White Oak Coal Company is the sales agent for all of the mining subsidiary Companies, and each one of such Companies turns over the output of its mine to the White Oak Coal Company, to be marketed by the latter. The White Oak Coal Company sells all of these coals mined by the various subsidiary Companies, and turns the money derived from such sales into its own treasury, and, instead of settling with each one of the subsidiary Companies whose coal it has sold, it applies the proceeds of such sale to the wants or needs of any other subsidiary Companies that it may choose, or The New River Company may direct. Whenever one of the subsidiary Companies has a pay roll to meet, it is met out of the treasury of the White Oak Coal Company, whether there is any money on hand to the credit of the particular company or not, and, in this way, wherever one mine may be run at a loss, its shortages and indebtedness are met out of the sales of coal from other mines that are operating at a profit.

"The plaintiffs further say that they are informed and believe, and here charge, that the two mines of the defendant the Stuart Colliery Company, the two mines of the defendant the Great Kanawha Colliery Company, and perhaps other of the mines of certain of the subsidiary Companies have been, and are now, operated at a great loss, and that the moneys earned at the mines of the other subsidiary Companies have been turned over to the losing mines, in order to keep them going, thereby destroying the profits of the subsidiary Companies as a whole, and denying dividends to the stockholders of the holding Com-

pany, The New River Company. They further say that this management of the properties of the subsidiary Companies is not only unjust to these plaintiffs and to the other stockholders of The New River Company, resulting in loss to them, but is an absolute fraud upon those stockholders of the subsidiary Companies which are doing a profitable business who are not stockholders of The New River Company.

"That the business of the mining subsidiary Companies has been conducted in the manner aforesaid through the White Oak Coal Company, and under the control of the defendant The New River Company, until the White Oak Coal Company has become, and is now, indebted, on account of coal delivered to it by said subsidiary defendant Companies, and by it sold and unaccounted for, to said subsidiary mining companies in an aggregate sum of more than $425,000. This indebtedness is distributed among said defendant Companies as follows: To the Beckley Coal & Coke Company, $17,111.67, to the Cranberry Fuel Company, $25,664.65, to the Collins Colliery Company, $76,834.64, to the Dunnloop Coal & Coke Company, $110,-275.63, to the Great Kanawha Colliery Company, $19,069.02, to the Harvey Coal & Coke Company, $23,887.93, to the Mabscott Coal & Coke Company, $17,665.81, to the Macdonald Colliery Company, $45,433.58, to the Price Hill Fuel Company, $7,229.19, to the Stuart Colliery Company, $49,284.56, to the White Oak Fuel Company, $37,758.98, total $430,215.66.

"And has become, and is indebted, in addition to the foregoing, to the subsidiary railway companies of The New River Company, on account of money borrowed, as follows: To the Piney River & Paint Cr. R. R. Co., $13,682.55, to the White Oak Railway Company, $12,244.23, total $25,926.78.

"That the manner aforesaid of conducting the business of the subsidiary defendant Companies by and under the control of the defendant of The New River Company constitutes a gross mismanagement of the business and properties of said subsidiary Companies, as well as of The New River Company itself; that the sales agent, the White Oak Coal Company, has been, and is entitled to only 8% as a commission upon the sales of coal made by it for the subsidiary Companies, and this sum, and only this sum, it was entitled to receive for its services upon such sales,

and the residue of the proceeds of all such sales should have been paid by it into the treasury of the various subsidiary Companies furnishing and delivering the coal to it for sale. Said White Oak Coal Company has, however, failed and refused to so conduct its business, and the defendant The New River Company has so controlled and conducted the business of the White Oak Coal Company by permitting and directing it, the said White Oak Coal Company, to retain in its own treasury all of the moneys derivable from the sales of the coal of the subsidiary Companies, thereby enabling it to create the debts aforesaid, until great embarassment and loss has been occasioned thereby to said subsidiary Companies, with the result that such of the subsidiary Companies as are mining leaseholds are in great danger, in consequence of the terms of their leases, and in consequence of their inability to pay royalties by reason of the lack of funds, of losing their entire properties.

"The following of the subsidiary Companies; that is to say, the defendant the Beckley Coal & Coke Company, the Collins Colliery Company, the Cranberry Fuel Company, the Dunnloop Coal & Coke Company, the Great Kanawha Colliery Company, the Harvey Coal & Coke Company, the Mabscott Coal & Coke Company, the Macdonald Colliery Company, the Price Hill Fuel Company, the Stuart Colliery Company and the White Oak Fuel Company, are mining upon leased lands, and in their leases, and in the contract of lease of each of them, there is a forfeiture clause, forfeiting the leasehold upon the failure to pay royalties according to the terms of said lease when due, and giving the landlord in each lease the right to re-enter and take possession of the property embraced in the particular leasehold, together with the improvements thereon.

"That, as these plaintiffs are informed and believe, and so charge upon such information and belief, each of the last named Companies is now indebted to its respective landlord for royalties which have been for sometime, and are now, long past due, and the leasehold of each is, at the present time, subject to and in danger of forfeiture according to the terms of the lease, in consequence of the non-payment of royalties. This state of affairs has been brought about, as hereinbefore recited and alleged, through the mismanagement of said Companies by the improper

control and direction of their business by the defendant The New River Company, in consequence of the fact that it has permitted, and is permitting, the White Oak Coal Company to keep from and deprive said mining Companies, and each of them, of moneys properly payable to them as the proceeds of the coal mined by them."

Preparatory thereto, and a few days before the filing of the bill, formal protests and objections to the management were presented in stockholders' meeting, by Samuel Dixon and a few other stockholders, holding a small minority of the stock, some of them plaintiffs in this suit, the first in the form of a resolution, offered at the meeting held at Macdonald, West Virginia, on June 5, 1912; the other held in the City of New York, on June 12, 1912. The resolution, which was voted down, is as follows: "That the stockholders view with alarm the results of the management of the company's property for the past year as disclosed by the annual report now submitted, and we condemn the Board of Directors and the management in charge of the operation of the company's properties for this result." The formal protest to the stockholders, of June 12, 1912, was signed by John Faulkner, S. Dixon, J. W. Smiley, W. E. Deegans, Wm. Brown, and Symington Macdonald, Jr. It contains some twelve grounds of protest and objection to the management, substantially those covered by the bill, and as does the bill, they mainly relate to professed disagreements between protestants and the managing officers, directors and other stockholders, as to the management of the holding and subsidiary companies. Reference is made to the protest of June 5, 1912, which is re-affirmed. The eleventh paragraph of that protest, and the only one presenting real ground relied on for equitable jurisdiction, and the one covered by the ninth paragraph of the bill, is as follows: "11. They further charge that the management by The New River Company of its subsidiary companies has been such as to appropriate the profits of successful subsidiary Companies to the carrying of the unsuccessful ones, thereby defrauding and causing a loss to fall upon those stockholders of the profitable subsidiary Companies who are not stockholders of The New River Company."

The matter of the ninth paragraph of the bill, including the

matter of the several protests, is covered by the seventh paragraph of the answer of The New River Company, adopted also by the other defendants, as follows: "This defendant denies the allegations of the 9th paragraph of the Plaintiff's Bill in manner and form as alleged except in so far as they are admitted in this paragraph. This defendant says that said White Oak Coal Company was organized in the year 1903, by Samuel Dixon and his associates prior to the organization of The New River Company. That upon the taking over of the controlling interest in the subsidiary companies by this defendant, said Dixon and the plaintiff, James W. Smiley, who was then Treasurer of this defendant and of all its subsidiary companies, inaugurated the system of using the White Oak Coal Company as a convenient medium for a clearance of mutual accounts between companies. That originally the White Oak Coal Company was engaged in the selling of coal only to the extent of conducting a retail business at Richmond, Virginia, but subsequently said Dixon inaugurated the system of selling all of the coal produced by the operating subsidiary companies, except Tidewater coal, through the White Oak Coal Company. That by the system so inaugurated, said White Oak Coal Company was not required to keep the coal shipped by separate companies separate, or to keep the proceeds realized from the sale of such coal separate, but said coal was thrown into a common lot, and as distinguishing it from other New River coal was sold as 'White Oak Coal,' and the proceeds from the sale thereof paid into the treasury of the White Oak Coal Company, and the White Oak Coal Company became a debtor to the several operating companies for a proportional part of any operating company's share in the coal sold. That according to the representation of said Dixon said system was in the interest of all of the subsidiary companies and of The New River Company so far as concerned the most economical and expeditious handling of coal as it enabled the companies together to get the benefit of large contracts which they otherwise would not have been able to get the benefit of. That there was nothing in any respect fraudulent in such a relation between the White Oak Coal Company, as the selling agent, and any operating company, but on the contrary the system by which the relation of the sellers of coal for operating

companies and the operators is that of a debtor and a creditor and by which a guarantee of the accounts is substituted for an obligation to turn over specific proceeds, is the system which is most common between producers and sellers. That unless an operating company objects to such a relation, there is no reason in law or equity why it should not be established and continued. That the relation has continued for a period of many years without any objection on the part of any stockholder of any of the subsidiary companies, during which time it may have happened that the White Oak Coal Company while under the management and control of said Dixon has at different times made advancements to some of the subsidiary companies out of the money received by it from the sale of coal shipped by other subsidiary companies, but such advancements have been legally made and have been fully paid, as is shown by the schedule on pages 18 and 19 of the bill, from which it appears that the White Oak Coal Company is now a debtor to each of said subsidiary companies. That in each of said subsidiary companies, the continuance of the same relations as heretofore was authorized during the past year by votes of the Boards of Directors of each of said companies, a copy of which said vote is filed with this answer, marked Exhibit 4, and made a part hereof. That at the meetings of all subsidiary companies held on June 17th, 1912, the stockholders in each of said subsidiary companies unanimously voted to approve, ratify and adopt as the acts of the stockholders all action of the Board of Directors of said company as set forth in the records of said Board since September 21st, 1910, and all acts done in pursuance thereof, which said action and acts, copy of which said vote as passed in the stockholder's meeting of each of said subsidiary companies is herewith filed, marked Exhibit 5, and made a part hereof, included the continuance of said relations with White Oak Coal Company. That there is considerable indebtedness of the White Oak Coal Company to said subsidiary companies but not to the amounts set forth in the 9th paragraph of the plaintiff's Bill, and there is indebtedness from each of said subsidiary companies to The New River Company which will be turned over to the White Oak Coal Company and which will more than offset the indebtedness of the White Oak Coal Company to the

Beckley Coal & Coke Company, Cranberry Fuel Company, Great Kanawha Colliery Company, Harvey Coal & Coke Company, Price Hill Fuel Company, Stuart Colliery Company, Piney River & Paint Creek Railroad Company and the White Oak Railway Company, and substantially reduced the amounts owed by the White Oak Coal Company to the other subsidiary companies, but the time allowed for the filing of this answer has not been sufficient to enable the exact figures to be given. And this defendant says that the White Oak Coal Company has assets amply sufficient for the payment of all its debts, its balance sheet showing an excess of assets over liabilities, exclusive of capital stock, of $498,615.94. That the White Oak Coal Company has for some time been short of ready cash with which to promptly make payments to operating companies on account of its indebtedness to them, which is the reason for such a large indebtedness on the books of the White Oak Coal Company. That said shortage of ready cash is due largely to

"1. Investment made by said Dixon on behalf of said White Oak Coal Company, originally without authority on the part of the Board of Directors in land for a coal yard at Washington, D. C. in which about $40,000.00 has been expended in the purchase of a property and the extension of a bridge over a public street to tracks of the Philadelphia, Wilmington & Baltimore Railroad, and in legal expenses incident to litigation which has arisen in reference to said bridge.

"2. To a loss of approximately $65,000.00 incurred in the establishing of yards at Chicago, Ill., on the recommendation of said Dixon that the establishing of such yards would be greatly to the benefit and profit of the White Oak Coal Company and through it to The New River Company. Said yards were after about two years sold on the recommendation of said Dixon after the business so conducted showed the loss hereinbefore stated.

"3. To the tying up of $49,091.88 in coal shipped within the last few months to the Great Lakes Coal & Docks Company under contracts purporting to run for five years, which were executed in the name of the White Oak Coal Company by said Dixon, without the authority or knowledge of the Board, directly contrary to votes prohibiting the entering into such contracts without previous authority by the Board; the money of the White

Oak Coal Company being tied up in coal furnished to said Great Lakes Coal & Docks Company because they are of such poor credit that their notes cannot be discounted.

"That the Board of Directors of this defendant are fully alive to the undesirability of a continuance of any large indebtedness of the White Oak Coal Company to any of the operating subsidiary companies. That the existence of this indebtedness is one of the reasons why further funds should be raised by The New River Company in a proper manner, and why, by the increase of capital stock of the White Oak Coal Company subscribed for by the New River Company, or otherwise, the White Oak Coal Company, should be put in funds to pay said indebtedness. That it has been impossible to further finance the needs of The New River Company on a reasonable and advantageous basis while said Samuel Dixon continued in the office of President of The New River Company or its subsidiary companies, and that it was for that reason and for other reasons hereinafter set forth, that a change has recently been made in the executive head of said companies. That the Board of Directors of this defendant elected on June 5th, 1912, immediately took up this matter and voted such authority to its Executive Committee in conjunction with its Treasurer as would have enabled all financial needs of The New River Company and the subsidiary companies to have been taken care of on an advantageous and businesslike basis. Said needs would have been taken care of before the 1st of July had it not been for the bringing of these proceedings. That there is no complaint in this proceeding by any stockholder of any subsidiary company and that this complaint is not brought in behalf of any such stockholders but of stockholders in The New River Company. That the plaintiff, W. E. Deegans, is not a stockholder in either the Dunn Loop Coal & Coke Company or the Harvey Coal & Coke Company; but this defendant is informed that the Longdale Coal Company, of which the said Deegans asserts he is president, claims to have purchased some shares of stock in each of said companies. That S. A. Scott has never been the manager or had any control over the affairs of the White Oak Coal Company, but that said Samuel Dixon has continued ever since the organization of said Company up to the date of June 12, 1912, to be the President and

General Manager of said Company. That it was to enable this defendant to meet the needs of the White Oak Coal Company and to meet other difficulties which have been encountered because of the continuance of said Dixon as President that a new administration was on June 12th, 1912 put into office, and the plaintiffs by these proceedings, without giving the new administration any opportunity to act, are preventing the meeting of said needs and the solving of said difficulties.

"This defendant further says with reference to the losses referred to in the 9th paragraph of the Plaintiff Bill in the operations of the mines of the Stuart Colliery Company, and the mines of the Great Kanawha Colliery Company, that a large investment has been made under the administration of said Dixon in the mines of the Stuart Colliery Company the cost of sinking the shafts and developing the said mines having been greatly in excess of the estimates made by said Dixon under whose administration said shafts were sunk and the mines opened up. That further heavy losses have occurred in the operation of the Stuart Colliery Company on account of two explosions which occurred while said Dixon was General Manager of said Company. That it is not clear from the Plaintiffs' Bill as to how they claim the property of the Stuart Colliery Company should be dealt with except by continuing the development of the mines of said company to the point where they will have been brought to a profitable production, and if said course is to be pursued the properties must necessarily be operated during the intervening period. The plaintiffs allege in the 4th paragraph of their bill that said property is worth in reasonable value $500,000.00. An abandonment of said mines would according to the plaintiffs own allegation involve the sacrifice of that amount. And the defendant further says that some of the best coal produced in the New River field is produced at the mines of this Company, and that, as this defendant is informed and believes, it only requires the proper handling of said mines to make them pay satisfactory profits within a reasonable time. That the present Manager of the Stuart Colliery Company, S. A. Scott, has done extensive work in said mines, and has brought them to the point, as this defendant is informed and believes,

where they will, within a reasonable time, prove to be a satisfactory investment.

"With reference to the two mines owned by the Great Kanawha Colliery Company, this defendant says that said mines were bought in reliance on the representation of said Dixon that they would be a profitable and satisfactory investment, it being represented by him that the Great Kanawha mine would yield a return of 6% upon the investment and that the Eureka mine, of said Company, would make much in excess of said return. That in fact said mines have since they were acquired (except for a short period of time) proved unprofitable; that said Dixon, said Scott, the present Manager of the Great Kanawha Colliery Company, and the Board of Directors of The New River Company and of the Great Kanawha Colliery Company, have been in accord in the belief that it is desirable that said properties of the Great Kanawha Colliery Company should be disposed of, and have made every effort to dispose of the same on satisfactory terms, but on account of the depression in the coal trade, which has existed for several years past, they have been unable to find a purchaser who would purchase said property for a reasonable price and on satisfactory terms. And this defendant says that good business policy requires that the mines of the Great Kanawha Colliery Company should be carried until the property can be sold.

"This defendant denies that there has been any improper use of the moneys of the other subsidiary companies by the Stuart Colliery of the Great Kanawha Colliery Companies. It avers that it may have happened at times that the different subsidiary companies of The New River Company have accommodated one another by the loan of funds, but that this has always been legally done and with the consent and approval of all of the parties concerned. And this defendant denies that by reason of the use of any such funds there has been a failure to pay dividends to the stockholders of The New River Company.

"This defendant further says that only small amounts are due and payable at the present time from subsidiary companies for royalties on leases. That on no lease does the amount exceed $4,000.00 and that the aggregate of all amounts now so due and payable from the subsidiary companies is less than

$28,000.00. That the subsidiary·companies and each of them are amply able to pay said amount and that the lessors are entirely satisfied with the standing of their accounts since the change in administration made on June the 12th, 1912. This defendant denies that under the terms of any lease held by any subsidiary company is there a forfeiture of the lease if royalties are not paid when due, and says that under said·Dixon's management there have always been royalties due and unpaid, and that the allegation that there is any danger of the forfeiture of said leases or any of them on this account is unfounded and a mere pretence on the part of the plaintiffs to give color to their bill. And this defendant says that if this company and its subsidiary companies are not interfered with in this proceeding they are prepared at any time when demanded to pay up all royalties due or which may become due."

On awarding the appeal from the decree below, on July 12, 1912, on the petition of The New River Company, by two members of the court, all proceedings, on or under said decree, including any act or proceeding by the receivers appointed, were thereby stayed until the further order of the court. Later, at a Special Term, on motion of appellant, it was further ordered that until the further order of·the court, the powers of said receivers be wholly suspended and that they yield and deliver to appellants, their agents and servants, such possession of any and all of said property, books and papers, as they or any of them might then have. And afterwards on July 20, 1912, upon the joint petition of all of said subsidiary companies, appeals and supersedeases were also allowed them, and it then further ordered that until the further order of the court all proceedings on and under said decree, including any act or proceeding by the receivers appointed by said decree or either of them, should be and the same were thereby stayed, and the powers of the receivers were thereby wholly suspended, and they were required to yield and deliver to petitioners and to each of them, their agents and servants such possession of any and all of the property, books and papers of the petitioners as they or any of them had.

These actions of the court but presaged the disposition which we were then of opinion would finally have to be made of the

cause. Elaborate briefs of counsel have been presented, however, on final hearing, which call for respectful consideration. The real question is the one presented in the pleadings quoted, namely, has any fraud been shown in the conduct of the business by The New River Company and of its subsidiary companies, calling for the appointment of receivers? We think not. Assuming that the charges of the bill constitute fraud, they are fully met by the answers and proof. The methods, plans and policies of which protestants and complainants complain are none other than those inaugurated by the principal protestants and complainants when they were in financial management and executive control of the defendant corporations. The answers admit, as we have seen, that the system of allowing the White Oak Coal Company, the selling company, to become so largely indebted to the operating companies, is not desirable, and that the purpose is to remedy this as soon as The New River Company, the holding and financing company, shall have had time and opportunity to do so. Plaintiffs, most of whom are responsible for the conditions complained of, do not in their protests to the stockholders or in their bill, indicate how the business of The New River Company or of the White Oak Coal Company, owing to the condition in which they left them, could have been better financed, and the White Oak Coal Company provided with money to liquidate its indebtedness to the subsidiary companies. Besides the success of The New River Company, the holding company, and its ability to pay dividends depended not upon the success of one or more of the successful operating companies, but upon the success of all. Its property and assets consisted mainly if not entirely in its holdings of stock in the subsidiary companies. Its success, therefore, depended on the success of all its dependent and interdependent or allied corporations. It was bound to see that each had proper financial aid and succor. Their successes or failures necessarily involved its success or failure, for it was upon them that its own profits or losses depended. If financial aid to some of the weaker concerns was with the consent of the directors and stockholders of those companies furnished by advances through the selling company, of what have complainants as stockholders of The New River Company the right to complain? This constituted no fraud, cer-

tainly not as against stockholders of The New River Company. But respondents propose to right the supposed wrongs, regardless of the question of fraud charged, as soon as it is possible to do so, and thereby respect the very demands of complainants. What need of receivers, then, and why would the court appoint as receivers those who had been once in control, and had inaugurated the very irregularities complained of, and had been deposed for other irregularities charged in the answers, which have not been controverted.

A well grounded legal proposition particularly applicable here is, that when the equities of the bill upon which a receiver is sought are fully denied by the sworn answers of the defendants, and the evidence adduced in support of the bill does not overcome these denials, a receiver should not be appointed. *Wilson* v. *Maddox,* 46 W. Va. 641, 649, 33 S. E. 775, 778-9, citing High on Receivers, section 24. Our case just cited also holds that a receivership should be granted only under peculiar and urgent circumstances, and where the right to be protected is clear, and where there is no other safe or expedient remedy.

Another proposition, equally well grounded, and applicable also to the case at bar is, that individual stockholders must seek relief through the corporation itself, first by application to the directors, and then to the stockholders, before going into a court of equity on their individual initiative. The bill shows appeal to stockholders of The New River Company, but not to directors, and it does not appear that if the grievance was well grounded in fact, application to the directors would have been in vain; on the contrary, the answers impliedly, if not in terms, say that an adjustment of the accounts between the White Oak Coal Company, and the creditor subsidiary companies is intended, and will be accomplished as soon as money can be provided for the purpose. In what other way could the wrong, if any, be righted? None is suggested. If we say that suit might be brought by the subsidiary companies against the White Oak Coal Company, the debtor company, or that such suit in equity might be maintained by them or some of them to compel by mandatory injunction the adjustment of the debtor and creditor accounts, no relief if any could be obtained except through the individual companies, and before individual stockholders of

, nose companies could intervene for that purpose, application would first have to be made to the directors, and then to the stockholders, unless it be clearly shown that such application would be a vain undertaking. No such showing is made here, and it is not pretended that application has ever been made to the directors or stockholders of the subsidiary companies. *Rathbone* v. *Gas Co.,* 31 W. Va. 798, 8 S. E. 570, 574. This is not the case of an insolvent corporation, involving the rights of creditors and stockholders alike, nor one of mismanagement so gross as to amount to fraud, and on that ground calling for a receiver, such as *Lamp* v. *Building Association,* 62 W. Va. 56; nor one showing fraudulent appropriation of the corporate funds, by managing directors and stockholders, as was the case of *The Wayne Pike Co.* v. *Hammons,* 129 Ind. 368, relied on by plaintiffs' counsel.

On the case as presented on this hearing, we are of opinion, that there was gross abuse of power in the appointment of special receivers, and that the decree and order appealed from appointing them should be set aside, reversed and annulled, and that the orders heretofore entered by this Court in relation thereto, stand confirmed and made absolute and the cause remanded for further proceedings to be had therein, in accordance with the principles and directions given herein, and it will be so ordered.

                                        *Reversed and Remanded.*